Stephen Sherlag, on behalf of Mr. Everist, and to the extent the courts will allow, I will certainly cede the balance of my time to Mr. Buchel and try and join in his arguments as well on most of the legal issues. What I'd like to focus on with regard to Mr. Everist is he was clearly at the very lowest level of subsistence minor, and there's certainly no suggestion in the record that it was necessary for him at any point to file a notice of intent or for him to file a plan of operations. What was he doing out there? He was, he had a sluice box, he had buckets and pans, he was digging and he was trying to locate a load. His mining operation was actually within visual sight of a very successful load that was found in the past hundred years. Was he living out there? He was, he was mining and living there incidental to his mining. I see. So he had a camper that was there, and there was a tent on the property as well. He had shovels, he had buckets, he had sluice pans, he had extremely low-level mining, no mechanized equipment whatsoever, no backhoes. Occasionally in the summertime, there was some mechanized dredging going on, but literally there were buckets that he would pick up and carry and dump and move rock. And if you, if you, if I could take the Court to that site, you could see what he was doing was very traditional, very low-level subsistence mining and staying there incident to the mining. And I would like to point out to the Court that essentially I think what ended up occurring in terms of the U.S. Forest Service thinking about this is that what they're trying to do is outlaw subsistence mining by saying only groups of miners who have got lots of property and lots of money can reside on U.S. Forest Service land. And at the very low level, the folks who are with their hands and knees getting the dirt and the rocks themselves, trying to manually locate the loads, which is what occurred for hundreds of years on this land, is no longer allowed. And that essentially what they put in place here is a sort of economic balancing test, saying, well, you must not be making enough money here. And what the government has continued to do to protect this land. So is this your defense? I'm sorry, Your Honor? Is this your defense at trial? My defense at trial is, first of all, it relied on the fact that there are three levels of mining operation, and that Mr. Evers' level is at the very lowest level, which is under the CFRs themselves of the U.S. Forest Service, does not involve the use of mechanized earth-moving equipment, such as bulldozers or backhoes, such that he could proceed without any notice whatsoever to the U.S. Forest Service, and that he would be allowed, while mining, to be allowed to, reasonably incident to his mining, reside on the property. We also contested the U.S. Forest Service's ability to cite him in the fashion as described by Mr. Buechel. So we attempted to put out as much information as we can to put out and set forth the  And we found that he was not personally on the land, residing at a very low level. And did the judge allow you to do that? To a limited degree. Certainly not to the full degree that we wished. What was the limited degree? To what was the extent of the limited degree? Well, Judge Mossman didn't want us to in any way significantly attack that, that area of our defense. And essentially, the testimony was extremely brief. Okay. And I think it certainly could have been filled out greater than the record. And I think, as Counsel earlier referred to in Mr. Everest's case, Judge Mossman found the sort of catch-22 position of Mr. Everest, saying that he's not so big that he needs to live there. Well, the test isn't how big you are. The test is, if you are in fact mining and the residency is reasonably incident to the mining, it's okay. And that's where we submit that our case is distinguishable from the other similarly situated parties here. But we believe the judgment as to whether the residence is reasonably incident to the mining. Who makes that judgment? Well, I think that the U.S. Forest Service could certainly go onto the property and view the activities of Mr. Everest and try and determine whether or not he was on a daily basis, in fact, mining. And if he was not on a daily basis, in fact, mining, such that he needed to stay there, for instance, if he was sitting around eight hours a day playing checkers with his friends or throwing darts or fishing, then he wouldn't be mining and he wouldn't need to stay there. But as long as he was putting in a legitimate workday, mining, in this remote location, remembering he's ---- But they determined that he did go out and the ranger said he wasn't mining. They looked at the property that he had there. They thought that the property had the ---- But they made the determination. Now you are arguing how they made the determination. Having been told that he wasn't mining, what did Mr. Everest then do? Mr. Everest has, in almost every venue possible, sent letters contesting the validity of the U.S. Forest Service's action. I didn't anticipate some of the argument here and questions of the Court in that area for today's argument. I can certainly supplement the record if necessary, but the record here is replete of Mr. Everest consistently indicating the U.S. Forest Service is acting outside of its jurisdiction, is acting outside the authorization, acting outside the grant of the mining laws, and that he's acting properly in his actions here. Did any of those letters entail seeking a review by the Forest Service of his decision? Specifically, I do not recall that, Your Honor, no. But continually contesting the authority of the U.S. Forest Service to act in the manner in which it was. The question I pose is who makes that decision? And I think you indicated in your answer, well, the Forest Service is entitled to make the decision. You can test the basis upon which this decision was made, but if they're entitled to make the decision, isn't the proper course of action, if you want to challenge that decision, is to seek review of it within the Forest Service? What I would suggest, Your Honor, respectfully, is the proper method is that the U.S. Forest Service believes that he is not mining such that the residency is necessary, is reasonably incident to it, that it should have filed for an ejectment of him in civil court. And I've heard from several counsel the argument they should have taken civil relief action, and I presume they could have taken civil relief action. But the availability of civil relief doesn't customarily mean there's no room for criminal prosecution if, in fact, there is a criminal statute applicable. So I hear the argument from you and others it would have been better for them to act civilly, but that doesn't speak to me, because it doesn't tell me they can't act in a criminal fashion. It may have been better for them to act in that fashion. I will concede that. But I would suggest to the Court that in this situation, you know, even in the supplemental excerpt of record provided by opposing counsel, they've conceded that the activity here was such that a plan of operation wasn't necessary. I think the proper steps, and there was no studies of the property indicating that there was a significant degradation of the land by Mr. Everest. I mean, this is sort of they came on, they looked at what was physically there. They didn't do a study of what he was doing. They didn't study the land itself. They didn't have a mineralogist out there. They didn't monitor what he was doing. They said, it doesn't look like enough. And so I submit that that's where we are. Kennedy. Thank you. Thank you. Roberts. Thank you. Neil Evans again on behalf of the United States. With regard to Mr. Everest, the Court did allow extensive testimony by cross-examination of Kevin Johnson and testimony by Mr. Everest regarding the extent of his mining activity. Mr. Sherlag may describe it as minimal, but in response to my motion in limine, the judge, who had another hearing, said, we're going to take a break, came back on the bench and said, you know, it will be easier to hear this testimony than it will be to argue about it some more. Let me hear it. At some point later, I objected again. The judge said, you know what? Let's just continue. I'll hear the testimony. And the testimony was completed, or the examination was completed, regarding the extent of Mr. Everest's mining activity. At the end of the day, the Court, in its ruling, as I said before, said, you know, Mr. Sherlag and Mr. Everest, it's kind of a catch-22 here. You're either mining enough to justify, to try and justify a year-round residence, in which case you come under the 228 regs, or you're not mining enough, and you can't justify a year-round residence. And that's the evaluation the Court made. That's the balance the Court made, as I've said repeatedly today, between the 228 regs and the 261 regs. The elements of 261 are, are you maintaining a residence on National Forest Service land? Now, this hasn't been addressed before. We've always talked about this unless language being an affirmative defense, and it being, at least initially, the burden of the defendant to put forth some evidence on that affirmative defense. Well, in all of these cases, I think mostly because of the legal arguments that were being made, that we, we don't fall under the 261 regs, or we don't need any authorization from the Forest Service, the government basically took on the responsibility of establishing that there was no authorization. We assumed that element, that was an element of these 261 charges. And we said, we're prepared to prove that these defendants were, maintained a residence, and they didn't have authorization. And in fact, if you look at the transcript of the day before all of these trials, and, you know, they were two or three hour trials, Judge Mossman essentially said, do we really have any factual disputes here? You know, it's perfectly appropriate for the defense to put the government to its burden, you go ahead and do that. But as I see it, I don't see any factual disputes here. You all concede that you're maintaining a residence, or you all admit it, and you all agree that you don't have authorization. The quibble is, do I need authorization? And particularly in the Everest case, again, the judge said, look, you're trying to find that fine line, and that's fine, you can do that, that's an affirmative defense, but there's trouble with it, it's a catch-22, and I find it. I don't see how they could ever prove, I mean, or not prove, but I don't see how they could ever raise that defense in light of the position that we made that, we made the finding that there is authorization that can't be rebutted. In these, under these facts, when all of these defendants, in particular Mr. Everest in this case, is maintaining a semi-permanent structure on Forest Service land, I think the case law is fairly clear, including Hall, which is cited in our brief. Rare is the instance where a residency is not going to require some sort of plan or authorization. It just strikes me as odd, you say on the one hand, you know, they can raise an affirmative defense, but not really. The judge was fairly specific in saying, to the extent that the agency has determined that you don't have an approved plan of operation, I am not at liberty to say that to revisit that factual determination, particularly when you didn't appeal it. Well, I think the Catch-22, it bothers me here, and it underlies all of this. I mean, we have, we've had, we've heard an argument that says, look, the approach the Forest Service has taken eliminates low-level mining activities, at least in remote areas. If you're speaking of some place that's a mile away from non-Forest Service land where people can lawfully reside, okay, you can go back and forth, but you go to remote areas, going back and forth may not be practical, and yet we're now in a situation saying the fact of residence by itself may require a plan of operation, or at least a notice of intent. If you look at the regulation for notice of intent and the specifications of when notice of intent is not required, it really doesn't speak in terms of residence, it speaks in terms of the level of mining or prospecting activity. It's becoming an unwritten rule that residents can't go along with it if the level of mining activity is that low, and I'm not sure where the source of that is. I respectfully disagree that it's becoming an unwritten rule. I think in all of these cases, the Forest Service evaluated the facts as they were presented, whether it be the back lens where you see in the supplemental excerpt of record there is a detailed discussion back and forth about what the plan would be, what would be allowed and what wouldn't be allowed, to visits in Everest on two different occasions, discussions with Mr. Everest about what he was doing, and then the signs that we see on, you know, nailed to the trees, which are part of the supplemental excerpt of record, and the conversations with Mr. Everest and Mr. Ames and Fournier, which basically say you don't have authority to regulate my activity. Given that response, I don't think it's the same as saying that the Forest Service is coming up with some unwritten policy that remote residents will never be allowed. I think if there were facts presented to the agency that there was a remote location, there was actual mining going on, and year-round residency was incidental to that mining activity, maybe they live in Pasadena, maybe they live in Hawaii, I don't know, where the winter storms, the winter weather, the snow is going to prevent somebody from, not prevent somebody from mining year-round. Each district is going to evaluate those particular facts, and I don't think there's anything in the record in any of these cases that indicate the Forest Service didn't attempt to reasonably engage any of these folks. And so Mr. Buechel, whose argument is that this was the unfettered discretion of the district ranger to file criminal charges, it just is wrong. You know, these cases were presented to the U.S. Attorney's Office as some form of package saying we have a number of people out here who are residing on Forest Service land, they've ignored administrative regulations, they've ignored various district rangers. These folks are from all over the east down to southern Oregon. Can't something be done by this? And so it was the discretion of the U.S. Attorney's Office to file Class B misdemeanor informations as one group. This past summer, I'm sure there were law enforcement officers out on Forest Service and BLM and other Federal lands that filed notices, you know, provided somebody a notice of violation under the Central Violations Bureau docket, Class B misdemeanors for violations of the 261 regs and comparable regulations under the Bureau of Land Management. That's the balance that the courts have struck. That's the balance that the Ninth Circuit has recognized, that the mining regulations and the requirement of the Forest Service to manage lands must be read together, and that's all that was done in all of these cases. Unless there are any other questions, I submit them. Thank you. Thank you. Counsel. I want to try and zero in on the question of criminalization of occupation. Judge Clifton says, well, there's a criminal statute. Does it matter if they have a civil remedy? There's a criminal statute. It's 18 U.S.C. 1863. It says if there's a valid regulation closing land and you camp on it, you can be convicted of trespass. That's the only criminal statute. What we have here is a regulation, and it is a regulation issued pursuant to a specific grant of authority to prevent depredations. It is not within the scope of that grant of authority to treat occupation without more as a depredation, and that is what is going on here. We know it's not within the grant of authority because if we read the mining law, it expressly says that the land shall be free and open for occupation. Congress meant something when it said that. Now, that may no longer be fashionable. The Forest Service may no longer like it. All we are saying is that when a statute grants a right of occupation, that's why these miners put up signs on there. They read the law, they read the law, and it says we have a right of occupation, and they think the Forest Service people are nuts. And then if they sit down and read the regulations, they read the preamble to the regulations, this regulation, by its terms, excludes activities authorized by the mining law. Well, Judge Clifton, you made very trenchant observations about 261.10b. When such authorization is required means that sometimes it's not. That piece of the case, so does the preamble. If the preamble says that this whole scheme, that for the first time in a hundred years, they decide to do some test case, it wasn't that, oh, what can we do about these miners? In our record, you'll see that they considered and rejected the option of civil action. They decided to make a test case. They decided to throw out a hundred years of precedent and say this regulation, which says it doesn't apply to activities authorized by the mining laws, does, and we're just going to do it. Scalia. Excuse me? Didn't this Court say that in Doremus? That prefatory language with regard to the Mining Act doesn't serve to pull miners entirely out from under these regulations. I would say that they don't have to be out entirely. There are activities that are beyond the bare grant of occupation in the mining laws. And I understand the very broad argument. It strikes me as it's exactly the argument that Doremus said didn't fly. Doremus had a very – Doremus had two things going on. One was wild destruction of stuff in violation of other regulations, and the other was a deviation from an approved operating plan. And a deviation from an approved operating plan is a horse of an entirely different color, as the McClure Court explained, than the type of thing we have here, which is we're going there, there's no requirement of authorization in the law, there's nothing in Part 228 that tells us this, there's nothing in Part 261 that tells us this. Due process says that people of ordinary intelligence should be able to read the law and determine what it means. You cannot read the mining law and Part 261 and conclude that when some ranger comes up and tells you, well, we said you didn't need a plan or, well, you're abandoning your plan, you're going to do this notice-level stuff. By the way, we sent a letter about doing the notice-level stuff. It's SCR 14. That was after the plan had been rejected. Nobody of reasonable intelligence could believe that suddenly they are a criminal for doing – for acting without authorization when there's no rule at all that requires the authorization. This case is about, you know, what America is, what the rule of law is. Kennedy, they're not being cited for mining activity, they're being cited for the residence. Residence is occupation. They may have the authority without – they may have the legal ability without authorization to conduct the mining activity. Does that necessarily mean they have the ability to establish the residences that they have? Yes, because of the word occupation in the mining law, because of the doctrine of pettis possesio, because of a hundred years of mining precedent, you've got to be there to protect your claim. You know, Mr. Evans has gone off and talked about what happened last summer. You want to know what really happened last summer? Some people came in and started stealing the gold off Ms. Backman's claim, and we had a hell of a time trying to – Okay, we're going outside the record. Okay, all right, but that's last summer. All right, you've got –  Very limited time, and I'm going to hold you to it. Okay. Okay? Okay. Occupation, it's what it said in United States v. Shumway. The miner's occupation of the land is an inherent and integral part of mining law. It is what it means to give a possessory property right. We hear over and over again, you don't have authorization, you don't have authorization. It's like, wait a minute, this is private property. This is a possessory private property right. Congress grants a possessory property right with a right of possession with the idea that you occupy it and mine it to fulfill the statutory purposes. This is Congress's choice, and this is the choice that the Forest Service is casting aside in derogation of the statutes. It is setting the whole mining law aside and saying, we don't care about that. We just don't want people in the forest. And that's not their decision to make. Mr. Sherlag was wrong when he said the Forest Service has some unilateral right to decide whether there's enough mining going on. That is not the law. The law is that if the Forest Service disagrees with the mining activity, it goes to the interior and it does its validity examination or it comes into court because it believes, like in United States v. Brunskill, that something's being done that's totally unreasonable that's injuring its reversionary interest in the property. Thank you, counsel. We appreciate the argument. It's been an informative morning. Thank you. Thank you.
judges: Fisher, Paez, Clifton